IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **DANNY HAGGARD,** | : | **CIVIL ACTION NO. 1:22-CV-1881** |
| | : | |
| Plaintiff | : | (Judge Conner) |
| | : | |
| v. | : | |
| | : | |
| **HOLLY L. MITKOWSKI**, *et al.*, | : | |
| | : | |
| Defendants | : | |

### MEMORANDUM

This is a civil rights case filed pursuant to 42 U.S.C. § 1983. Plaintiff, Danny Haggard, alleges that employees of the Pennsylvania Department of Corrections ("DOC") and the Pennsylvania Board of Probation and Parole violated his rights in connection with a sexual relationship that he had with defendant Holly L. Mitkowski. Haggard has also moved for leave to amend to add a claim under the Americans with Disabilities Act ("ADA") against Mitkowski and to add two defendants to the case. We have screened the complaint pursuant to 28 U.S.C. § 1915A and conclude that it fails to state a claim upon which relief may be granted. The complaint will be dismissed with prejudice and the motion for leave to amend will be denied.

**I.      Factual Background & Procedural History**

Haggard, who is presently incarcerated in Luzerne County Correctional Facility, filed the complaint that initiated this case on November 17, 2022, and the court received and docketed the complaint on November 25, 2022. (Doc. 1). According to the allegations in the complaint, Haggard was a prisoner of the DOC

incarcerated in State Correctional Institution-Retreat ("SCI-Retreat") when defendant Mitkowski began to flirt with him. (Doc. 1 at 9-11). Their relationship allegedly became sexual in September or October of 2017, when Mitkowski called Haggard into an empty office, unbuttoned his pants, and sexually stimulated him with her hand. (Id. at 12). Over the next several months, Haggard and Mitkowski allegedly had numerous liaisons in which they performed manual sexual stimulation on each other, and Mitkowski allegedly performed oral sex on Haggard on two occasions in December 2017. (Id. at 12-13).

Haggard was released from DOC custody on January 29, 2018, and transferred to a halfway house in Philadelphia, Pennsylvania. (Id. at 13-14). Shortly before his release, Mitkowski allegedly gave him a note with her telephone number and instructions to contact her when he was no longer in DOC custody. (Id. at 14). Haggard subsequently contacted Mitkowski from the halfway house, and the two began to regularly exchange text messages. (Id. at 15).

After completing forty-five days of in-patient treatment, Haggard began the second phase of reentry, during which he began working as a truck driver for Coca-Cola. (Id.) Around this time, Mitkowski allegedly began traveling to the Philadelphia area regularly and renting a room at a hotel in Bensalem, Pennsylvania. (Id.) Haggard and Mitkowski had sex regularly at this location. (Id.)

Haggard and Mitkowski's relationship became more serious in the ensuing months. They allegedly got engaged to be married on December 31, 2019, and Haggard began living at Mitkowski's home in Hunlock Creek, Luzerne County, Pennsylvania in February 2020. (Id. at 17-18). Haggard and Mitkowski planned to

2

wait to get married until one year after completion of Haggard's parole so as to conceal the nature of their relationship. (Id. at 17). Haggard allegedly moved to Hunlock Creek without permission from his parole officer, but he continued to maintain his residence in Philadelphia and regularly traveled back to Philadelphia to meet with the parole officer. (Id. at 18).

Haggard began employment with a concrete company in West Wyoming, Pennsylvania. (Id.) He received payment from the concrete company in alternating forms of cash and check to "create an inconsistent trail with payroll taxes and [his] location." (Id.) During this time, Haggard and Mitkowski allegedly argued frequently about whether Haggard should buy a car, but Mitkowski urged him not to do so because registering a car in Hunlock Creek would alert Haggard's parole officer to the fact that he was actually residing there. (Id. at 19). Haggard purportedly responded that he could register the car in Philadelphia to conceal his place of residence from his parole officer, but ultimately agreed not to buy a car. (Id.) Mitkowski allegedly monitored DOC and state parole records through her access as a DOC employee to determine whether parole officials were aware that Haggard was living in Hunlock Creek. (Id. at 19-20).

At some point after Haggard's move to Hunlock Creek, Mitkowski allegedly began expressing that she wished to have a child with Haggard. (Id. at 20). They unsuccessfully tried to conceive a child for approximately three months, at which point they employed a fertility specialist, who discovered that Haggard's sperm count was low. (Id. at 21). Mitkowski began fertility treatments, which caused financial strain on their relationship. (Id.) Haggard began to experience periodic

3

erectile dysfunction, which caused Mitkowski to become angry. (Id. at 22). After one incident of erectile dysfunction, Mitkowski allegedly threw a porcelain mug at Haggard's head. (Id.)

On July 19, 2021, Haggard and Mitkowski got into an argument about the fertility treatment and their attempts to conceive a child. (Id.) During the argument, Mitkowski allegedly called the police and stated that someone had broken into her house and was trying to kill her. (Id.) Two police officers arrived at the house and asked Haggard who he was and how he had gotten to Mitkowski's home. (Id. at 24). Haggard, confused by the question, responded that he had been living in Mitkowski's home and working in the area for the past eighteen months. (Id.) Haggard then told the officer that he was on parole in Philadelphia and that he was not authorized by his parole officer to be living in Hunlock Creek. (Id.) During this conversation, Mitkowski allegedly called Haggard's parole officer using Haggard's phone. (Id. at 24-25). Mitkowski handed the phone to the police officer, at which point the parole officer and the police officer spoke briefly. (Id.) The parole officer then ordered Haggard to return to Philadelphia by the end of the week. (Id.) The police officers allowed Haggard to call his employer, who sent his adult son to Mitkowski's home to pick Haggard up. (Id. at 26). The officer then allowed Haggard to gather his belongings from Mitkowski's home and to leave with the employer's son. (Id.)

The next day, July 20, 2021, Mitkowski, who was still employed by the DOC at the time, informed her supervisors that she had had a sexual relationship with Haggard during his incarceration at SCI-Retreat. (Id. at 27). Later than day, she

allegedly filed for a protection from abuse ("PFA") order against Haggard in the Luzerne County Court of Common Pleas. (Id.)

Haggard returned to Philadelphia on July 22, 2021. (Id. at 28). Before his departure from Luzerne County, however, his employer informed him that he was welcome to return to Luzerne County to work and to live in the apartment located above the business's office. (Id.) Haggard accepted the offer and requested a change of address with his parole officer. (Id. at 29).

Haggard returned to Luzerne County on July 29, 2021 to obtain a paycheck from his employer and to attend a hearing in the ongoing PFA proceedings. (Id. at 30). The court of common pleas granted Mitkowski's PFA request, issuing a PFA order against Haggard for a three-year period. (Id.) Haggard alleges that shortly after this hearing he began using drugs and alcohol "excessively" every day. (Id.) Haggard allegedly began a period of severe substance abuse for the next several weeks, during which he got into two fights with strangers. (Id. at 31).

On August 23, 2021, Mitkowski requested that the court of common pleas withdraw the PFA against Haggard because she no longer felt threatened. (Id. at 32). The court of common pleas modified, but did not withdraw, the PFA. (Id.) Shortly after making this request, she began to travel to Philadelphia on weekends to visit Haggard. (Id.) Haggard's request for change of address was then approved by his parole officer in late September or early October of 2021. (Id. 32-33). Haggard returned to work for his former employer in West Wyoming, Pennsylvania and began living in the apartment above the business. (Id. at 33). Shortly after moving, he was required to report to a new parole officer in Luzerne County. (Id. at

5

34). The parole officer conducted a urine test, and Haggard tested positive for cocaine. (Id.) Haggard was given a warning and required to attend out-patient drug counseling. (Id.)

Mitkowski spent most nights at Haggard's apartment in West Wyoming in this period, during which Haggard and Mitkowski got into frequent arguments because Mitkowski did not like coming to the business or the apartment in West Wyoming. (Id. at 35). Haggard allegedly could not go to Mitkowski's home because of conditions imposed by the terms of the PFA. (Id.) Sometime after she reported her relationship with Haggard to DOC officials, Mitkowski was allegedly terminated from her position with the DOC. (Id.)

Haggard's parole officer in Luzerne County came to his apartment approximately two months after he moved to West Wyoming and administered a urine test. (Id. at 36). The test was negative, but the parole officer informed Haggard that he needed to attend a batterers group for six months because of the PFA. (Id.) The complaint alleges that this was the last time Haggard saw the parole officer before the end of his relationship with Mitkowski and his subsequent arrest. (Id.)

On an unspecified date after the parole officer's visit to the apartment, Haggard and Mitkowski began arguing about his living arrangement, with Mitkowski allegedly stating, "it's not good for you to live where you work." (Id. at 38). Haggard responded, "I would still be living with you had you not called the cops on me." (Id.) Mitkowski then allegedly said to Haggard, "you don't get it do you? You always were kind of dense. The reason I don't think it's good for you to

6

live where you work, is because I'm fucking your boss. If you can't give me a baby boy maybe he can, he has three sons." (Id.) Haggard "lost control" after Mitkowski made this statement, which resulted in Mitkowski's dog biting him. (Id. at 39). Mitkowski then grabbed the dog, ran out of the apartment, and left in her car. (Id.)

After Mitkowski left, Haggard allegedly went downstairs to his employer's basement where he grabbed a bottle of liquor and a shotgun. (Id.) Haggard drank some of the liquor and placed the barrel of the shotgun in his mouth, intending to commit suicide. (Id.) He was allegedly too intoxicated to pull the trigger, however, and he fell asleep. (Id.) Haggard was subsequently arrested for events unconnected to the facts of this case and placed in Luzerne County Correctional Facility, where he is presently incarcerated. (Id. at 43).

Haggard raises claims in the complaint against Mitkowski for cruel and unusual punishment in violation of the Eighth Amendment, violation of his right to due process under the Fourteenth Amendment, and state-created danger. (Id. at 52-55, 64-65). He additionally raises claims against Cliff O'Hara, the former director of professional responsibility at SCI-Retreat; Norm Demming, the warden of SCI-Dallas; and two John Doe defendants who were formerly employed at SCI-Retreat for violation of Haggard's right to due process. (Id. at 55-58, 62-63). Finally, he raises claims against his parole officers, defendants Davis, Wren, Mullany, and Ulrich, for violation of his right to substantive due process. (Id. at 58-61, 65-67). Haggard's claims against the parole officers are based on theories of failure to protect and state-created danger. (Id.) Haggard has additionally moved for leave to amend the complaint, seeking to add a claim against Mitkowski under Title II of the

7

ADA and to add due process claims against two new defendants, Wayne Inniss and Mr. Ransom. (Doc. 6).

## II. Legal Standard

The Prison Litigation Reform Act authorizes a district court to review a complaint in a civil action in which a prisoner seeks redress against a governmental employee or entity. See 28 U.S.C. § 1915A.[1] The court is required to identify cognizable claims and to *sua sponte* dismiss any claim that is frivolous, malicious, fails to state a claim upon which relief may be granted, or seeks monetary relief from a defendant who is immune from such relief. See 28 U.S.C. § 1915A(b).

## III. Discussion

Haggard brings his claims under 42 U.S.C. § 1983. Section 1983 creates a private cause of action to redress constitutional wrongs committed by state officials. 42 U.S.C. § 1983. The statute is not a source of substantive rights, but serves as a mechanism for vindicating rights otherwise protected by federal law. See Gonzaga Univ. v. Doe, 536 U.S. 273, 284-85 (2002); Kneipp v. Tedder, 95 F.3d 1199, 1204 (3d

---

[1] 28 U.S.C. § 1915A provides:

**(a) Screening.**--The court shall review, before docketing, if feasible or, in any event, as soon as practicable after docketing, a complaint in a civil action in which a prisoner seeks redress from a governmental entity or officer or employee of a governmental entity.
**(b) Grounds for dismissal.**--On review, the court shall identify cognizable claims or dismiss the complaint, or any portion of the complaint, if the complaint--
   **(1)** is frivolous, malicious, or fails to state a claim upon which relief may be granted; or
   **(2)** seeks monetary relief from a defendant who is immune from such relief.

8

Cir. 1996). To state a Section 1983 claim, plaintiffs must show a deprivation of a "right secured by the Constitution and the laws of the United States . . . by a person acting under color of state law." Kneipp, 95 F.3d at 1204 (quoting Mark v. Borough of Hatboro, 51 F.3d 1137, 1141 (3d Cir. 1995)).

### A.     Claims Against DOC Defendants

At the outset, we will dismiss Haggard's claims arising from his incarceration in SCI-Retreat because it is clear from the face of the complaint that they are time barred. See, e.g., Feingold v. Brooks, 791 F. App'x 325, 326 (3d Cir. 2020) (nonprecedential)[2] (noting that district courts may dismiss complaints as time barred pursuant to the screening provisions of 28 U.S.C. § 1915 if the untimeliness is clear from the face of the complaint). Civil rights claims filed pursuant to Section 1983 are governed by Pennsylvania's two-year statute of limitations for personal injury actions. Wisniewski v. Fisher, 857 F.3d 152, 157 (3d Cir. 2017). Haggard's claims, which are based on events that occurred prior to Haggard's release from DOC custody on January 29, 2018, needed to be filed no later than January 29, 2020 to comply with the two-year statute of limitations. Because they were not filed until November 17, 2022, they are clearly untimely and will be dismissed.

### B.     State-Created Danger and Failure to Protect Claims

Haggard's claims against Mitkowski and the parole defendants, which assert due process violations based on theories of state-created danger and failure to

---

[2] The court acknowledges that nonprecedential decisions are not binding upon federal district courts. Citations to nonprecedential decisions reflect that the court has carefully considered and is persuaded by the panel's *ratio decidendi*.

9

protect, will also be dismissed for failure to state a claim upon which relief may be granted.  In general, the government has no duty to protect people from harm.  Mears v. Connolly, 24 F.4th 880, 883 (3d Cir. 2022) (citing DeShaney v. Winnebago Cnty. Dep't of Soc. Servs., 489 U.S. 189, 195-96 (1989)).  But there are two exceptions to this rule: the state-created danger exception and the special relationship exception.  Jiminez v. All American Rathskeller, Inc., 503 F.3d 247, 255 (3d Cir. 2007).  The state-created danger exception recognizes that when the government affirmatively places an individual in a position of danger that the individual would not have otherwise faced, the government must protect the individual from the danger it created.  Mears, 24 F.4th at 883.  The special relationship exception recognizes that when the government takes a person into custody against his will, the government has an affirmative duty to ensure his safety and wellbeing.  Morrow v. Balaski, 719 F.3d 160, 167-68 (3d Cir. 2013).

Claims of state-created danger require allegations that (1) plaintiff suffered foreseeable and fairly direct harm; (2) the state "acted with a degree of culpability that shocks the conscience"; (3) plaintiff was a foreseeable victim or a member of a discrete class of persons potentially harmed by the state's actions; and (4) the state affirmatively used its authority in such a way that placed plaintiff in danger.  Mears, 24 F.4th at 883-84 (citing Bright v. Westmoreland Cnty., 443 F.3d 276, 281 (3d Cir. 2006)).

Haggard's complaint fails to plead a state-created danger claim against Mitkowski because she was not acting as a state actor in any of the actions she allegedly performed after Haggard's release from DOC custody.  The complaint fails

to plead a state-created danger claim against the parole officers because it fails to allege any action by the officers that placed him in danger. Haggard's claim is based on the theory that the parole officers' actions put him in danger of abuse by Mitkowski, but based upon the allegations in the complaint it is clear that the officers did not know the nature of Haggard's relationship with Mitkowski and that Haggard actively concealed the relationship from them. (See Doc. 1 at 17-20, 24, 36). Furthermore, the complaint does not allege any actions by the parole officers that shock the conscience, as the actions they allegedly performed are routinely performed by parole officers, such as meeting with the parolee, obtaining urine samples from the parolee, and approving his requests to move residences.

Finally, turning to Haggard's failure to protect claim, neither our court of appeals nor the United States Supreme Court has decided whether parolees have a special relationship with the state entitling them to protection from harm. We need not decide whether such a special relationship exists, however, because even if it did Haggard has not alleged sufficiently culpable conduct by the parole officers to state a claim for violation of his due process rights. The complaint indicates that Haggard actively concealed his relationship with Mitkowski from the parole officers and that the officers did not know the circumstances of the relationship. (See Doc. 1 at 17-20, 24, 36). Hence, the complaint at most alleges that the parole officers were negligent because they should have been aware of the risks posed by Haggard's relationship with Mitkowski, but "[m]ere negligence is never sufficient for substantive due process liability." Nicini v. Morrow, 212 F.3d 798, 810 (3d Cir. 2000).

Accordingly, the complaint fails to state a due process claim against the parole officers upon which relief may be granted.

### C. Leave to Amend

Before dismissing a civil rights complaint for failure to state a claim upon which relief may be granted, a district court must permit a curative amendment unless the amendment would be inequitable or futile. Phillips v. Allegheny Cty., 515 F.3d 224, 245 (3d Cir. 2008). We will deny leave to amend as futile in this case because Haggard's claims arising from his incarceration are time barred and because the parole officers did not have sufficient knowledge of the circumstances of Haggard's relationship with Mitkowski to support a due process claim under either a state-created danger theory or a special relationship theory.

We will additionally deny Haggard's motion for leave to amend, which seeks to add a claim under Title II of the ADA against Mitkowski and to add due process claims against two new defendants, Wayne Inniss and Mr. Ransom. (Doc. 6). We find that leave to amend would be futile with respect to the ADA claim against Mitkowski because damages are not available against individual defendants under Title II of the ADA. See, e.g., Kokinda v. Pa. DOC, 779 F. App'x 938, 942 (3d Cir. 2019); (nonprecedential); Bowens v. Wetzel, 674 F. App'x 133, 136 (3d Cir. 2017) (nonprecedential); Matthews v. Pa. DOC, 613 F. App'x 163 (3d Cir. 2015) (nonprecedential). Amendment would also be futile to the extent Haggard seeks to add claims against Innis and Ransom because Haggard fails to make any factual allegations against Innis or Ransom in his complaint or his proposed amendment. (See Docs. 1, 6-1).

**IV.** **Conclusion**

We will dismiss the complaint with prejudice and deny the motion for leave to amend. An appropriate order follows.

/S/ CHRISTOPHER C. CONNER<br>
Christopher C. Conner<br>
United States District Judge<br>
Middle District of Pennsylvania

Dated:    December 19, 2022